# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| v. | : Hon. Leda Dunn Wettre |
| SEBASTIAN ULANGA | : Mag. No. 21-13416 |
| | : **CRIMINAL COMPLAINT** |

I, Joseph Patricola, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Department of Labor, Office of the Inspector General, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

                                                                                       __/s/Joseph Patricola__
Joseph Patricola, Special Agent
U.S. Department of Labor
Office of the Inspector General

Special Agent Patricola attested to this Affidavit by telephone pursuant to Fed. R. Crim. P. Rule 4.1(b)(2)(A).

December 13, 2021
District of New Jersey

| | |
|---|---|
| Honorable Leda Dunn Wettre | _/s/Leda Dunn Wettre_ |
| United States Magistrate Judge | Signature of Judicial Officer |

**ATTACHMENT A**

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud)**

From as early as in or around August 2017 through in or around January 2020, in the District of New Jersey, and elsewhere, defendant

**SEBASTIAN ULANGA,**

knowingly and intentionally conspired and agreed with others to execute a scheme and artifice to defraud the Victim Fund, a health care benefit program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of the Victim Fund, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

## COUNT TWO
## (Kickbacks Related to an Employee Benefit Plan)

From in or around August 2017 through at least in or around January 2020 in the District of New Jersey and elsewhere, the defendant,

**SEBASTIAN ULANGA,**

an employee of the Victim Fund, did receive and agree to receive a fee, kickback, commission, gift, loan, money, and thing of value, namely, at least approximately $10,000 and trips to Las Vegas, cigars, alcohol, and VIP box tickets to a professional sports game, because of and with intent to be influenced with respect to his actions, decisions, and other duties relating to matters concerning the Victim Fund.

In violation of Title 18, United States Code, Sections 1954.

# ATTACHMENT B

I, Joseph Patricola, am a Special Agent with the United States Department of Labor-Office of the Inspector General ("DOL-OIG") in the Office of Labor Racketeering and Fraud Investigations, and a Task Force Officer with the Federal Bureau of Investigation ("FBI"). I have knowledge of the following facts based upon both my investigation and discussions with other law enforcement personnel and others. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not included each and every fact known to the government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Overview of the Health Care Fraud and Kickback Scheme

1. Defendant SEBASTIAN ULANGA ("ULANGA") accepted bribes—specifically, thousands of dollars in cash payments, travel, and tickets to sporting events—in exchange for using his connections and position within the Victim Fund to arrange for and market unsanctioned health fairs that his conspirators then used to defraud the Victim Fund. ULANGA also attempted to conceal and coverup his involvement in the health fairs when questioned by both the Victim Fund and law enforcement.

### The Defendants, Relevant Individuals, and Background Information

2. At various times relevant to this Complaint:

    a. Defendant ULANGA resided in the Bronx, New York. He was an employee of the Victim Fund in the position of outreach coordinator.

    b. Cooperating Witness-1 ("CW-1") has held the following positions: (1) president and owner of a medical diagnostic testing company ("Diagnostic Testing Company-1"); (2) owner of a preventive medical screening company ("Preventive Screening Company-1"); and (3) manager of a medical services company ("Medical Services Company-1").

    c. Cooperating Witness-2 ("CW-2") resided in Chester, New Jersey. CW-2 was self-employed.

    d. Individual-1 was the Chief Executive Officer of a health care company with several subsidiaries that conduct medical billing (collectively, "Health Care Company-1") located in Lynbrook and Mineola, New York.

e.      Individual-2 resided in Queens Village, New York, and was the owner of a mobile medical testing company ("Mobile Testing Company-1") located in Roslyn Heights, New York.

f.      Doctor Witness-1 was a medical doctor and cardiologist with an office in Hazlet, New Jersey. He was the owner of Medical Services Company-1 and was an affiliated provider with both Diagnostic Testing Company-1 and Medical Services Company-1.

g.      The "Victim Fund" was one of the largest labor-management funds for one of the largest health care unions (the "Union") in the United States. The Victim Fund provided a range of comprehensive benefits to over 400,000 working and retired health care industry workers and their families ("Members"). The Members enjoyed complete health benefits at little or no cost. The Victim Fund was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b). The Victim Fund was a benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

h.      In order for the Victim Fund to have issued payments on the claims for medical services, the services must have been medically necessary, meaning they must have: (1) been consistent with the diagnosis and treatment of the patient's condition; (2) been in accordance with the standards of acceptable medical practices; (3) not been solely for the convenience of the patient; (4) been performed at a level of care not greater than required for the patient's condition; (5) resulted in a measurable and ongoing improvement in the patient's health; and (6) resulted in a change in diagnosis or proposed treatment plan. Claims must have also accurately indicated where the medical services were rendered.

### **The Scheme to Defraud**

3.      In general, a health screening fair is an event designed to provide basic preventive medical screening to people in a specific community or employees at a specific location, which allows for minimizing costs by screening many people at one time. Health fairs commonly provide routine testing, such as cholesterol testing and blood pressure screenings. However, as set forth below, organizers of health fairs may take advantage of and defraud health insurance programs by conducting medically unnecessary and more expensive testing and then submitting claims for reimbursement to the insurer for unlawful profit.

4.      From in or around August 2017 through in or around January 2020, ULANGA participated in a scheme whereby he used his connections with the Union and position with the Victim Fund, to allow CW-2, CW-1, and co-conspirators to run unauthorized health fairs (the "health fairs") for Members

at the Members' places of employment in order to conduct unnecessary medical testing on the Members that would then be billed to the Victim Fund for payment to the co-conspirators.

5. To encourage Members to attend the health fairs, ULANGA assisted CW-2 and co-conspirators in advertising the health fairs to Members as free preventative health screening events, as described in more detail below. CW-2 and co-conspirators would hire medical professionals to work at the health fairs to conduct certain medical exams and testing. CW-2 and other conspirators would direct the medical professionals to conduct as many tests as possible on as many Members as possible, regardless of whether the medical testing was necessary.

6. Co-conspirators with medical billing companies, including CW-1 and Individual-1, would then submit claims to the Victim Fund for reimbursement. As set forth in more detail below, between in or around 2016 and 2018, CW-1 submitted claims causing the Victim Fund to issue overpayments in the amounts of approximately $2,684,261 to Diagnostic Testing Company-1 and Preventive Screening Company-1, and approximately $196,175 to Medical Services Company-1. Additionally, between in or around May 2019 and December 2019, Individual-1 submitted claims to the Victim Fund in the amount of approximately $529,060 causing the Victim Fund to issue overpayments in the amount of approximately $394,650 to Health Care Company-1.

7. Between in or around January 2017 and March 2018, the Victim Fund received over 11,000 claims from Diagnostic Testing Company-1 for Members for which Doctor Witness-1 was the rendering provider. Of those claims, there were approximately 900 claims for establishing new patients, approximately 664 claims for nerve conduction studies, and approximately 161 claims for allergy skin tests. All of 900 claims were fraudulent. In fact, Doctor Witness-1 had not established new patients, and had not conducted any nerve conduction studies or any allergy testing for any of the Members.

8. Additionally, during that same time period, the Victim Fund received over 900 claims from Medical Services Company-1 for which Doctor Witness-1 was the rendering provider to Members. Of those claims, there were approximately 98 claims for nerve conduction studies and approximately 32 claims for allergy skin tests, even though Doctor Witness-1 did not conduct any allergy testing or nerve conduction testing for any Members. All claims submitted by CW-1 through Diagnostic Testing Company-1 and Medical Services Company-1 used a place of service code that falsely represented to the Victim Fund that Members had been seen in the providing physician's office, despite that fact that all testing had been conducted at the Members' places of employment and Doctor Witness-1 interpreted all examinations from an office in New Jersey.

9. The claims submitted by CW-1 to the Victim Fund indicated that nearly every Member treated at the health fairs set up by CW-2 had the same complaint or symptom. For example, over 80% of the Members were given the same principal diagnosis of headache, cough, dizziness, or general muscle weakness. Over 90% of the Members had been ordered to undergo the same diagnostic testing. CW-1 had represented to the Victim Fund that the health fairs were to provide preventive medical services. However, preventive screening diagnosis billing codes were not used. CW-1 misrepresented diagnosis codes to the Victim Fund in order to justify the ordering of the many unnecessary diagnosis tests.

10. Approximately eight Members were interviewed between on or about May 5, 2018, and May 24, 2018. The claim forms for all eight Members that CW-1 submitted to the Victim Fund indicated that, at the time that they had been examined, they had been suffering from some sort of illness or had some sort of medical complaint. However, all eight Members stated during the interviews that they had not been sick when they had attended the health and wellness fairs, but rather were told by their employers they were to attend as part of their annual physicals and job-related preventive services. Each of the eight Members confirmed that all medical services had been rendered at their place of employment, and not at a physician's office.

11. Based on my training and experience investigating health care and other fraud, it is highly improbable that every Member who attended the health fairs would have had the same chief complaint or symptom. It is similarly improbable that over 90% of the Members would require the same diagnostic testing. Contrary to the claims data, which asserted that all testing had been medically necessary, a review of the claims data submitted to the Victim Fund shows that it was not. Furthermore, despite the assertion that the health fairs provided preventive medical services, CW-1 did not use preventive diagnosis codes when submitting these claims. Rather, CW-1 falsely submitted misrepresented diagnosis codes to justify the ordering of diagnostic tests, which were, in fact, not necessary, in order to receive payments from the Victim Fund for the unnecessary testing.

12. Thus, CW-1's submission of claims to the Victim Fund indicating that over 80% of the Members were suffering from headaches, coughs, dizziness, or general muscle weakness was also a false representation. Similarly, CW-1's submission of claims for unnecessary diagnostic testing for over 90% of the Members was also false.

13. As a result of these false claims, ULANGA and the co-conspirators caused the Victim Fund to issue overpayments in the amounts of approximately $2,684,261 to Diagnostic Testing Company-1 and Preventive Screening Company-1, and approximately $196,175 to Medical Services

Company-1. Additionally, between in or around May 2019 and January 2020, Individual-1 submitted claims to the Victim Fund for testing done at the health fairs totaling approximately $600,000. As a result of the fraudulent claims, the Victim Fund paid Health Care Company-1 a total of approximately $415,000.

Payments to ULANGA

14. Beginning in or around August 2017, CW-2 approached ULANGA, because of ULANGA's position at the Victim Fund, for the purpose of arranging health fairs for several nursing homes and health care facilities where Members worked. CW-2 and CW-1 decided which medical tests to conduct and which doctors and health care providers would conduct the tests. These decisions were not based on the medical needs of the Members, but rather on the profitability of the test based on the high rates the Victim Fund paid for each test. ULANGA assisted CW-1 and CW-2 by ensuring that the health fairs would be billed as "in network" services with the Victim Fund, by utilizing his position with the Victim Fund to check the coverage of the services provided at the health fairs.

15. CW-2 and the co-conspirators created marketing brochures and flyers to post in the facilities to advertise the health fairs to the Members. To encourage maximum participation in the health fairs—and thus increase the number of members for whom they could submit fraudulent claims—the conspirators insisted that the marketing materials stated that the health fairs were "free" with "no co-pay," to encourage maximum participation by Members.

16. At various times in or around 2016 through in or around 2019, ULANGA assisted CW-2 by introducing CW-2 to the individuals who ran various nursing homes and health care facilities in New York where Union Members worked. ULANGA and CW-2 both met with the owners of the facilities to promote the health fairs and encourage participation by Members. Using cash obtained by CW-1, CW-2 paid ULANGA anywhere from approximately $3,000 to $10,000 in cash per health fair, depending on how many Members attended. CW-2 also gave ULANGA numerous gifts to bribe ULANGA, including trips to Las Vegas, cigars, alcohol, and VIP box tickets to a professional sports game.

17. Specifically, on or about August 19, 2018, ULANGA attended a sporting event at Yankee Stadium with approximately five other individuals in which luxury transportation and attendance was paid for entirely by CW-2. Additionally, on several occasions CW-2 bribed ULANGA with high priced boxes of cigars, among other things, in order to influence ULANGA and secure his continued promotion of the health fairs.

18. From in or around January 2017 through in or around March 2018, the Victim Fund's Fraud and Abuse Department (the "FAD") received

referrals from multiple internal and external sources related to an upward trend of high-dollar payments to select providers for conducting multiple diagnostic tests on Members of the Victim Fund. The FAD received multiple external member complaints regarding, among others, CW-1's companies. On or about March 26, 2018, the FAD opened an internal investigation into the complaints and assigned a private investigator (the "PI") to conduct a complete review of the referrals and complaints.

19. In or around November 2019, ULANGA was questioned by officials with the Victim Fund as to his knowledge of and involvement in the health fairs and specifically, his knowledge of CW-1's Preventative Screening Company-1. ULANGA denied involvement with the health fairs and with CW-1's companies, including Preventative Screening Company-1

20. In or around November 2019, in order to make the health fairs appear legitimate, ULANGA provided CW-2 with a letter addressed to the Chief Executive Officer of a large health care company that ran 60 nursing facilities throughout New York, New Jersey, and Rhode Island. The letter from ULANGA encouraged the nursing homes to allow Health Care Company-1 to conduct health fairs at the nursing homes. Specifically, the letter assured that Health Care Company-1 was "in network with [the Union's] coverage," and that "[t]he health screenings conducted at each site was done at no cost and no bills to our union membership."

21. On or about January 16, 2020, ULANGA met with CW-1, CW-2, Individual-1, and others and discussed the health fairs. Specifically, ULANGA advised CW-1 and CW-2 of a phone call he had received from an employee of the Union who was questioning the authorization of the health fairs and the billing to the Victim Fund.

22. On or about January 24, 2020, was interviewed by officials with the Victim Fund in connection with the FAD's investigation into the health fairs. Among other things, ULANGA denied ever attending any of the health fairs and denied involvement with Preventative Screening Company-1.

23. On or about January 30, 2020, I conducted a voluntary interview of ULANGA. ULANGA admitted that he had attended one of the Health Fairs to get tested himself and acknowledged that he had sent at least one letter in support of the Health Fairs upon CW-2's request. ULANGA falsely denied receiving any payments, compensation, gifts, or event tickets from CW-2.

24. On or about March 6, 2020, the FAD issued a report of the findings of the investigation into the Health Fairs and ULANGA's involvement. Among other things the FAD issued findings that: (1) coordinating events with outside vendors or connecting outside vendors with Nursing home or Facility management is not in the job description of an "Outreach Coordinator," which was ULANGA's title;  (2) that

ULANGA admitted to attending a Health Fair event with his children on or about March 28, 2018 but according to his timesheet, was working from approximately 9 a.m. to 4:15 p.m. on that day; (3) and that ULANGA was dishonest during the investigation when he had stated he did not know of the Preventative Screening Company-1 because emails showed him communicating with Preventative Screening Company-1 dating back to in or around March 2018.  ULANGA's employment with the Victim Fund was subsequently terminated as a result of the FAD's investigation.